JOURNAL ENTRY and OPINION
{¶ 1} Appellant Sean Woodland appeals his convictions for four counts of drug trafficking and two counts of possession of drugs. He assigns eight errors for our review.[1]
 {¶ 2} Having reviewed the record and pertinent law, we affirm Woodland's convictions. The apposite facts follow.
 {¶ 3} Woodland, and his co-defendant, Tyrone Rand,[2] were arrested on September 16, 2003 for trafficking in crack cocaine. They were jointly indicted on seven counts. Counts one and two were for drug trafficking in violation of R.C. 2925.03, first degree felonies, both with major drug offender specifications attached; counts three and four were for drug trafficking in violation of R.C. 2925.03, fifth degree felonies; count five was for drug possession in violation of R.C. 2925.11, with a major drug offender specification attached, a first degree felony; count six was for possession of drugs in violation of R.C. 2925.11, a fifth degree felony; and, count seven was for possession of criminal tools in violation of R.C. 2923.24. These charges arose from Woodland's participation in selling crack cocaine to an informant.
 {¶ 4} Woodland filed a motion to suppress, which was opposed by the State. Woodland sought to suppress statements he made to police, contending that he was not advised of his Miranda rights. Woodland also filed a "Motion to Enforce Resolution Agreement Under Seal." A hearing was conducted on both motions; both motions were denied. Thereafter, Woodland waived his right to a jury trial and the matter proceeded before the bench.
 {¶ 5} The evidence indicated Cleveland Police officers used a confidential informant to make a controlled purchase of nine ounces of crack cocaine from Woodland and Rand. The initial target was Rand; however, Woodland subsequently incriminated himself by partaking in the sale.
 {¶ 6} Rand and the informant met on September 15, 2003 to discuss the purchase. Both the informant and his vehicle were wired. The next day, the informant and Rand met again at Rand's East Cleveland house. Initially, the tape recording of the meeting is of Rand and the informant discussing the quality of the cocaine. Woodland, however, joins the discussion and gives the informant a sample of crack cocaine. Woodland is heard on the tape discussing the quality of the cocaine and also the price of the nine ounces the informant intended to buy. The tape also reveals Woodland stating he sells lower quality crack to "fiends" or small time drug users. Woodland offered the informant his driver's license as an assurance that everything was "cool."
 {¶ 7} A meeting was arranged for later that day for the sale of the nine ounces. Undercover officers observed Woodland and Rand arrive at the agreed location for the sale, which was the parking lot at the McDonalds located at East 152nd and St. Clair. Rand and Woodland parked their car in a parking lot next to the McDonalds' parking lot. Rand approached the informant's vehicle on foot and told him two East Cleveland Detectives were in the parking lot. He then instructed the informant to meet him at his house.
 {¶ 8} The Cleveland undercover officers followed Rand's vehicle, but were impeded by traffic. The officers then decided to stop Rand's car and arrest both Rand and Woodland because the informant told them that he believed Woodland and Rand had the nine ounces.
 {¶ 9} As the police approached the vehicle on foot, Woodland exited the vehicle and ran. Uniform officers, assisting the detectives, chased Woodland and apprehended him. Nine ounces of crack cocaine was found stuffed in Woodland's pants. $580 was also found in his back pocket. Prior to being booked, Woodland voluntarily removed a bag of crack cocaine he had hidden in his sock.
 {¶ 10} Officers testified that Woodland was read his Miranda rights at the time of his arrest and prior to attempting to interrogate him at the station. According to the officers, Woodland bragged he knew it was a set-up because he recognized two East Cleveland detectives in the McDonalds' parking lot. He then stated he did not want to cooperate, so the officers ended the interrogation.
 {¶ 11} Several days later, Woodland's girlfriend contacted the lead detective on the case, Edwin Cuadra, and told him that Woodland wanted to speak with him. Detectives Cuadra and Cudo brought Woodland back to the interrogation room. The detectives advised him of his Miranda rights prior to speaking with him. The officers then advised Woodland of the different penalties he was facing under federal and state jurisdictions. Woodland responded that the cocaine amount was actually less than 100 grams because non-narcotic substances were added to the cocaine to make it weigh more. The detectives explained the purity did not matter under state law. Woodland than discussed the possibility of "his people" cooperating on his behalf to keep the charges in the state's jurisdiction.
 {¶ 12} Based on the above evidence, the trial court found Woodland guilty of all charges except possession of criminal tools. In sentencing Woodland, the court found him to be a major drug offender. Woodland was sentenced to the minimum of ten years on the major drug offender counts and one year on the fifth degree felony counts. The trial court ordered all the terms to run concurrently with each other, for a total of ten years. Woodland now appeals.
 {¶ 13} Woodland argues in his first assigned error that the trial court erred by denying his motion to suppress the evidence. He claims the officers questioned him after he had invoked his right to remain silent and also argues he was not properly advised of his Miranda rights.
 {¶ 14} We begin our analysis with the appropriate standard of review. The court in State v. Lloyd[3] stated:
"our standard of review with respect to motions to suppress is whetherthe trial court's findings are supported by competent, credibleevidence. * * * This is the appropriate standard because `in a hearing ona motion to suppress evidence, the trial court assumes the role of trierof facts and is in the best position to resolve questions of fact andevaluate the credibility of witnesses.' However, once we accept thosefacts as true, we must independently determine, as a matter of law andwithout deference to the trial court's conclusion, whether the trialcourt met the applicable legal standard."[4]
 {¶ 15} In the case herein, three officers testified to notifying Woodland of his Miranda rights and recited verbatim the Miranda warning that was issued to Woodland. According to the officers, Woodland was read his Miranda rights while being handcuffed, when he was initially brought into the interrogation room, and, again several days later when he was brought back to the interrogation room. Therefore, there was sufficient evidence for the trial court to determine that Woodland was advised of his Miranda rights.
 {¶ 16} Moreover, there was no evidence presented indicating that Woodland's comments to police after being read his rights were involuntary. The test for voluntariness is whether, in light of the totality of the circumstances, the police obtained incriminating statements by coercion or improper inducement.[5]
 {¶ 17} The day of his arrest, after being Mirandized, Woodland was asked a basic booking question regarding whether he had any other drugs. He stated he did and removed a bag of crack from his sock. He then made statements in which he bragged to the detectives how he knew it was a set-up. This statement can hardly be described as coerced. After he made the statement, he said he did not want to talk anymore, and, the record indicates, no further questions were asked.
 {¶ 18} We also find the trial court did not abuse its discretion by allowing evidence of the officers' discussion with Woodland several days after Woodland invoked his right to remain silent. According to Detective Cuadra, Woodland's girlfriend called him and informed him that Woodland wished to speak with him. At the suppression hearing, the girlfriend denied that she told the officers this. She contends she contacted them to see if she could work out a deal with the officers on Woodland's behalf. Because the credibility of the witnesses is for the trial court to resolve, we defer to the trial court's determination that the detectives were more credible than the girlfriend.
 {¶ 19} The evidence further indicated that Woodland was again advised of his Miranda rights at this meeting. In response to the officers informing him of the potential prison time involved, Woodland volunteered that the cocaine was not pure. There is no evidence that this statement was coerced. Accordingly, Woodland's first assigned error is overruled.
 {¶ 20} Woodland argues in his second assigned error that the trial court erred by allowing testimony that Woodland stated "no" when, after being read his Miranda rights, he was asked if he wished to say anything. The record in fact indicates that Woodland did not respond at all after being asked the question, but remained silent.
 {¶ 21} The testimony that Woodland refers to occurred at his suppression hearing; therefore it did not constitute evidence of his guilt. Thus, no prejudicial error occurred. Moreover, the subject matter of the suppression hearing was whether Woodland was notified of his Miranda rights and whether these rights were violated. Therefore, it was necessary to discuss if Woodland invoked his right to remain silent and whether the officers abided by this request. Accordingly, Woodland's second assigned error is overruled.
 {¶ 22} In his third assigned error, Woodland argues the trial court erred by denying his motion to suppress his arrest. Woodland contends he was arrested by officers who used excessive force and who did not observe him engaging in criminal conduct.
 {¶ 23} We note initially that Woodland's arrest was not the subject of his motion to suppress. "By failing to file a motion to suppress illegally obtained evidence, a defendant waives any objection to its admission."[6] Nonetheless, reviewing the claim for plain error, we find no reversible error.
 {¶ 24} The evidence indicated that the drug buy-bust involved several officers working as a team to arrest Woodland and Rand. Several detectives and uniformed police officers, in an undercover van, were in constant contact with the undercover officers in charge of the controlled buy. It was not until the undercover officers radioed the van that the uniformed officers executed their arrest of the suspects. At this time, there was probable cause to arrest Rand and Woodland because the detectives had evidence that Woodland sold a rock of cocaine to the informant and also offered to sell nine ounces of crack cocaine. The informant told detectives that based on the behavior of Rand and Woodland at the McDonalds' parking lot, he believed they had the nine ounces with them. Therefore, probable cause existed to arrest Woodland.
 {¶ 25} Moreover, there was no evidence that excessive force was used to arrest Woodland. Woodland engaged the officers in a foot chase down two streets. The officers had to tackle him in order to detain him. There was no evidence that Woodland was injured by this use of force, nor do we conclude the tackling constituted excessive or deadly force. Accordingly, Woodland's third assigned error is overruled.
 {¶ 26} Woodland argues in his fourth assigned error that the trial court erred by not enforcing a plea agreement his girlfriend had made on his behalf in exchange for her cooperating with police in staging undercover drug buys.
 {¶ 27} The trial court conducted a hearing on this issue prior to trial. The evidence indicated that the officers offered to keep Woodland's case within the state's jurisdiction if the girlfriend cooperated with them. This is the only promise the officers could make because police officers have no authority to enter into pleabargain negotiations; such agreements are unenforceable.[7] Only the prosecuting attorney has the authority to enter into plea agreements, subject to the review and approval of the court.[8]
 {¶ 28} Accordingly, the trial court did not abuse its discretion in denying Woodland's motion to enforce his girlfriend's agreement with the officers. Thus, Woodland's fourth assigned error is overruled.
 {¶ 29} Woodland argues in his fifth assigned error that he was prejudiced because the State failed to provide laboratory reports indicating the results of additional testing conducted on the crack cocaine. The first test only revealed the drugs were cocaine based. The additional testing indicated it was crack cocaine.
 {¶ 30} The record indicates that the prosecuting attorney was not aware that a second test was done on the drugs until after opening arguments were presented. The date on the report corroborates this fact. Woodland's counsel objected and requested a mistrial, or in the alternative, requested to withdraw the jury waiver. The trial court permitted defendant's counsel additional time to have the drugs independently tested and indicated it would allow the jury waiver to be withdrawn if that was requested after the independent testing. The independent test was conducted; the test results were consistent with the State's results indicating the substance was crack cocaine. Woodland's counsel did not request to withdraw the jury waiver.
 {¶ 31} Based on these facts, we conclude Woodland was not prejudiced by the State's failure to present the test results earlier. The trial court granted the continuance for further testing. Nor do we find the State purposefully delayed presenting the evidence. The date on the printed report reflects the date the State contended it received notice of the test. Accordingly, Woodland's fifth assigned error is overruled.
 {¶ 32} Woodland argues in his sixth assigned error that the trial court erred by allowing the crack cocaine, confiscated from Woodland, to be admitted, when it was obviously wet. Woodland maintains because there was no explanation why the drugs were wet, there was insufficient evidence of the chain of custody.
 {¶ 33} Chain of custody goes to the weight of the evidence and not to its admissibility.[9] "While the State bears the burden of establishing the proper chain of custody, said duty is not absolute."[10] To meet its burden, the State need only prove that it is "reasonably certain that substitutions, alteration or tampering did not occur."[11] The trier of fact determines whether the chain of custody has been established.[12]
 {¶ 34} In the instant case, the chain of custody was established from the testimony of those handling the drugs and their accompanying signatures in the evidence log books. The officers who confiscated the cocaine from Woodland gave the drugs to Lieutenant Garrick. The lieutenant testified he transported the drugs to the narcotics unit, where the detectives logged their information into the books, filled out evidence bags, and placed the drugs in a locked area. The next day, Detective Witherspoon took the evidence to the scientific investigation unit laboratory, where technicians received it and placed it in a tamper resistant bag.
 {¶ 35} Thus, there is no evidence that the chain of custody was ever broken. Moreover, there was no evidence presented which indicated the drugs were not wet when confiscated from Woodland. Accordingly, the trial court did not err by allowing the evidence to be admitted. Woodland's sixth assigned error is overruled.
 {¶ 36} Woodland argues in his seventh and eighth assigned errors that his conviction was not supported by sufficient evidence. Woodland contends he was convicted for merely being present at the scene, and that there was no evidence presented that he sold or offered to sell a controlled substance exceeding 100 grams.
 {¶ 37} The standard of review with regard to the sufficiency of evidence is set forth in State v. Bridgeman:[13]
 "Pursuant to Criminal Rule 29(A), a court shall not order an entry ofjudgment of acquittal if the evidence is such that reasonable minds canreach different conclusions as to whether each material element of acrime has been proved beyond a reasonable doubt."[14]
 {¶ 38} Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks[15] in which the Ohio Supreme Court held:
"An appellate court's function when reviewing the sufficiency of theevidence to support a criminal conviction is to examine the evidencesubmitted at trial to determine whether such evidence, if believed, wouldconvince the average mind of the defendant's guilt beyond a reasonabledoubt. The relevant inquiry is whether, after viewing the evidence in alight most favorable to the prosecution, any rational trier of fact couldhave found the essential elements of the crime proven beyond a reasonabledoubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S. Ct. 2781,61 L. Ed. 2d 560, followed.)"
 {¶ 39} In the instant case, the audiotape, the transcript of the audiotape, and the informant's testimony, support the conclusion that Woodland was involved both in the sale of the one rock and the nine ounces of cocaine. Both the informant's testimony and the taped conversation between the informant, and Rand, and Woodland indicate that Woodland sold the informant a rock of cocaine as a sample to test the quality of cocaine prior to buying the nine ounces. Woodland is heard on the tape discussing the different prices for nine ounces of cocaine depending on whether the informant desired "hard" or "soft" cocaine. Woodland also promised the informant he would receive a better quality of cocaine than Woodland supplies to the small users, which Woodland referred to as his "fiends."
 {¶ 40} Woodland also accompanied Rand to the sale of the nine ounces, and was in fact found with 251 grams of cocaine on his person. At the station, he voluntarily handed over another bag of rock cocaine he had hidden in his sock. Therefore, there was sufficient evidence supporting Woodland's convictions. Accordingly, Woodland's seventh and eighth assigned errors are overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Gallagher, J., and McMonagle, J., Concur.
 APPENDIX Assignments of Error
 I. Defendant was denied due process of law when the court overruled hismotion to suppress statements.
 II. Defendant was denied due process of law when the court allowedevidence of defendant's refusal to speak invoking his right of silenceand his right to an attorney.
 III. Defendant was denied due process of law when the court overruledhis motion suppress.
 IV. Defendant was denied due process of law when the court refused toenforce an agreement to which defendant was the intended third partybeneficiary.
 V. Defendant was denied due process of law when he was not timelyfurnished discovery.
 VI. Defendant was denied due process of law when the court admittedevidence where the state failed to prove a proper chain of custody.
 VII. Defendant was denied due process of law when he was foundguilty by mere presence.
 VIII. Defendant was denied due process of law when he was found guiltyof selling or offering to sell a controlled substance in an amount equalto or exceeding 100 Grams.
[1] See Appendix.
[2] Rand entered into a plea and was sentenced to ten years.
[3] (1998), 126 Ohio App.3d 95.
[4] Id.
[5] Haynes v. Washington (1963), 373 U.S. 503, 513; State v. Chase
(1978), 55 Ohio St.2d 237, 246-248.
[6] State v. Campbell (1994), 69 Ohio St.3d 38, 44, 1994-Ohio-492.
[7] State v. Matthews (1982), 8 Ohio App.3d 145, 146; Statev. Fulton (1990), 66 Ohio App.3d 215, 216.
[8] Id.
[9] State v. Richey (1992), 64 Ohio St.3d 353.
[10] In re Lemons (1991), 77 Ohio App.3d 691; State v. Moore (1973),47 Ohio App.2d 181.
[11] State v. Moore, supra.
[12] Columbus v. Marks (1963), 118 Ohio App.3d 359.
[13] (1978), 55 Ohio St.2d 261, syllabus.
[14] See, also, State v. Apanovitch (1987), 33 Ohio St.3d 19, 23; Statev. Davis (1988), 49 Ohio App.3d 109, 113.
[15] (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.